Filing # 131663037 E-Filed 07/29/2021 01:11:12 PM

**IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA**

SHERI MULLANE,                     Case No.:

       Plaintiff,                Division:

v.

AMERIS BANK,

       Defendant.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

1.     This is a suit for damages and injunctive relief under the Florida Civil Rights Act of 1992, Fla. Stat. § 760 et seq. (FCRA) and Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq, as amended by the ADAAA (hereinafter ADA) and the Age Discrimination in Employment Act of 1967, as amended, (hereinafter ADEA), 29 U.S.C. § 621 et seq.

### JURISDICTION

2.     This is an action for damages in excess of $30,000.00 exclusive of prejudgment interest, costs, reasonably attorney fees.

### PARTIES

3.     At all times relevant to this complaint, Plaintiff, Sheri Mullane, is a citizen of the United States, and the State of Florida and resides in Clay County, Florida.  She was employed by Defendant in Clay County, Florida, at all times material to this complaint although Plaintiff worked in Duval County during her employment as well. Plaintiff commenced employment with Defendant in April 2016 and was employed until her termination on September 5, 2019, as

ACCEPTED: DUVAL COUNTY, JODY PHILLIPS, CLERK, 07/30/2021 07:59:01 AM

described below. The decision to terminate was made by employees working Jacksonville, Florida in Duval County.

4.     At all relevant times to this complaint, Defendant, Ameris Bank is a foreign profit corporation licensed to do business in the State of Florida and at all times material to this complaint was Plaintiff's employer. Ameris Bank, at all times material to this Complaint, has employed fifteen (15) or more people, and is an "employer" within the meaning of the Florida Civil Rights Act and ADA. Further, Defendant Ameris Bank at all times material to this Complaint has employed at least twenty (20) employees and is an "employer" within the meaning of the Age Discrimination in Employment Act.

## CONDITIONS PRECEDENT

5.     Plaintiff has complied with all condition's precedent to the filing of this claim required by the Florida Civil Rights Act of 1992.  A timely charge of discrimination was filed with the Florida Commission on Human Relations within 365 days of the discriminatory acts complained of herein.  Said charge of discrimination was pending more than 180 days without any determination being made by the Florida Commission on Human Relations.  This action was filed within four years of the discriminatory acts. Plaintiff has complied with all condition's precedent to the filing of this suit required by the ADEA and ADA. The Plaintiff has filed timely administrative charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). The charge of discrimination was filed by Plaintiff with the Equal Employment Opportunity Commission in a deferral State within 300 days of the alleged unlawful employment practices.  Plaintiff has filed this suit within 90 days of receiving a right to sue notice. All administrative prerequisites have been satisfied and this suit is timely filed.

## STATEMENT OF FACTS

6.      Plaintiff was hired by Defendant in April 2016.  During her employment with Defendant, Plaintiff received performance reviews that meet or exceeded expectations and was never issued any form of disciplinary action prior to her termination.

7.      Plaintiff was initially hired to work as the Compliance Audit Manager working in the Auditing Department of Ameris Bank.

8.      Plaintiff had been working remotely, not due a disability related accommodation, from 2016 up until February 2019.  Plaintiff's original office space was located at Baymeadows Way in Jacksonville when she was in the Auditing Department. In the first month of her employment Plaintiff was scheduled to do an Audit of the branch in Fleming Island.  This branch was less than half a mile from her home. At that time, Mike Helms, who had been the Senior Risk Officer whose responsibilities included managing the Audit Department, stated that the Fleming Island was going to have office space opening up and that Plaintiff could work from that branch. As soon as the office space became available, Plaintiff began working at the Fleming Island branch.

9.      While working at the Fleming Island Branch, Plaintiff was given permission to work remotely from home since she wanted to work earlier then when the branch was opened.  In the latter part of 2016, Plaintiff's office space was reassigned to another department and she was permitted to work remotely on a permanent basis.

10.     In 2017, Plaintiff was diagnosed with cancer. As a result of complications from Cancer, she was hospitalized in June 2017 and was not permitted to return to work until July 2017. Since she had already been working remotely, Plaintiff never requested any accommodation for

her disabilities at that time and she continued to work remotely as she had done prior to her illness with permission of her then supervisor Sandy Robinson without any issue.

11.    Plaintiff has also suffered from a chronic episodic condition, vertigo for years preceding her termination. During episodes Plaintiff experiences severe nausea and dizziness.

12.    In October 2017, McKendry was hired as the Chief Risk Officer, and he supervised both the Auditing and Compliance Departments.

13.    In January 2018, McKendry, transferred Plaintiff to the Compliance Department. Effectively Plaintiff's position was realigned from the Internal Auditing Department to the Corporate Compliance Team. Plaintiff was never provided an explanation for the transfer even though she asked for one.  The position Plaintiff held in the Auditing Department as Compliance Review Manager, was a position that was mandated by the FDIC due to significant deficiencies in having independent Compliance Audits. Plaintiff expressed her concerns about the elimination of that position to both Dodge and McKendry, and neither provided her with any information as to how those Audits would be continued. The role was not well defined initially.  After the transfer, Plaintiff's first-line supervisor was Carolyn Dodge.

14.    On February 26, 2018, Plaintiff was requested by to Ms. Dodge to attend a meeting at her office, which she did.  At that time, Ms. Dodge advised Plaintiff that McKendry ordered that she would no longer be permitted to work remotely and that she would be required to work in the Gate Parkway office. Ms. Dodge had advised Plaintiff that McKendry did not want her to continue to work remotely. Plaintiff had never asked for an accommodation for her disabilities, until she was forced to demand an accommodation in February 2019.

15.    This demand was made while Plaintiff was still in recovery from complications from cancer. At this point in time, Plaintiff would have been unable to travel to the office. Plaintiff advised Ms. Dodge that if she would not be accommodated and be permitted to work remotely as she had been doing for the past almost two years, she was going to resign and file a charge with the EEOC.  Ms. Dodge then demanded a letter from Plaintiff's doctor to establish her disability. Ms. Dodge stated that Mr. McKendry wanted her to provide a doctor's note to prove that she had a disability. Ms. Dodge was fully aware of all of Plaintiff's disabilities. Nonetheless Plaintiff requested, obtained and presented a doctor's confirmation on the same day it was requested, as she had a doctor's appointment that same afternoon.

16.    Plaintiff's doctor's note did not specify her medical conditions but Defendant granted her request for accommodation which upon information and belief was based on the fact that Ms. Dodge and Mr. McKendry already knew about Plaintiff's disabilities. McKendry was fully aware of all of Plaintiff's vertigo and cancer diagnosis.  Ms. Dodge was aware that Plaintiff's cancer diagnosis, medications and side effects, her vertigo and her cataracts and complications from eye surgery.

17.    Thereafter, Plaintiff continued to attend meetings where her presence was requested as she had done prior to formalizing a work from home arrangement as a reasonable accommodation.

18.    Plaintiff received a rating of exceeds expectations for her 2018 performance evaluation which was the highest possible overall rating she could have received. Also Plaintiff was promoted to the position of Vice President for Compliance Systems in or about July 2019.

19.     The day before the Regional Brand Kickoff meeting for regional leaders ("branding meeting"), Plaintiff advised Ms. Dodge she was experiencing a severe Vertigo episode, and issues with her eyes due to cataract surgery and pain related a sprained ankle (from a fall the day prior which was caused by her vertigo) and that she really did not want to attend the meeting.

20.     Ms. Dodge made it quite clear to Plaintiff that her attendance was required at the meeting and that it might be detrimental to her career with Ameris if she didn't attend. That was the only reason Plaintiff attended the meeting.  Plaintiff's request to not attend was specifically based on her medical conditions and the fact that she had fell the day before as a result of a vertigo episode where she twisted and injured her ankle. Ms. Dodge insisted that Plaintiff attend.

21.     Ms. Dodge was fully aware that Plaintiff had suffered with Vertigo for years, and she also was fully aware that she was experiencing issues with her eyes since April 2019.  Plaintiff had been back to the surgeon over fifteen (15) times since the surgery as they were attempting to correct and treat the extreme light sensitivity and recurring eye infections that she was experiencing. Plaintiff had been at the eye doctor the day before the Branding Meeting, where she fell and twisted her ankle.  Ms. Dodge was also aware that Plaintiff's vertigo episodes were random and that the dizziness and nausea were not constant. Ms. Dodge was also aware that the reactions she had to her cancer medications occurred sporadically. Ms. Dodge was aware that the symptoms from the side effects of Plaintiff's cancer medications caused her to experience random hot flashes and chills.

22.     Plaintiff did telephone Ms. Dodge to advise her that she was attending the meeting, but that she still was not feeling well and advised her that she might have to leave the meeting if her condition got worse.

23.     Due to traffic, Plaintiff arrived at the meeting only a few minutes before it started and was seated at a table in the front of the room, closet to the doors and across from the windows.

24.     Within a few minutes of sitting down, and prior to the meeting having officially started or any speakers beginning their speeches, Plaintiff began experiencing difficulty seeing, her eyes started tearing profusely due to blinding sunlight shining through the windows across from her, this was the only window shade that had not been pulled down.

25.     McKendry was the first speaker at the meeting. As a result of the blinding light, Plaintiff was unable to face the front of the room where the speakers were standing.  For the first two hours of the meeting, Plaintiff was sitting sideways with her back towards the front of the room and her hand shielding her eyes from the light so she could view the screen located in the back of the room.

26.     Shortly after Plaintiff sat down at the Branding Meeting, she also started experiencing "hot flashes" and chills.  These were reactions to her cancer medication. One of the side effects from the medication is to produce the same symptoms of menopause, which resulted in Plaintiff beginning to sweat, getting overheated and then experiencing chills.   This resulted in Plaintiff continually taking her jacket on and off.

27.     Then Plaintiff began experiencing a Vertigo episode which resulted in her getting extremely dizzy and nauseous. All of the above occurred during the first two hours of the meeting. Mr. McKendry's presentation occurred during this period of time.

28.     Plaintiff advised the people sitting around her that she was experiencing difficulties generally, and specifically mentioned that she had recently had cataract surgery and that the light shining through the window was causing her extreme discomfort. Plaintiff made three requests for

the shade to be pulled down. Plaintiff and another individual (Scott Banford) sitting next to her at the table advised one of the organizers on several occasions, of the issue with the blinding light and requested that the shade be pulled down. The request was not complied with until almost two hours into the meeting, well after McKendry's speech. The person Plaintiff asked to close the shades at the meeting was a female employee who was leading the meeting. Plaintiff told her specifically that she was having an issue due to recent cataract surgery, and that she was being blinded by the light and requested that the shades be closed at the front of the room, as they had been closed in the back of the room. The gentleman at the table with Plaintiff asked this same person to close the shade as Plaintiff did. After Plaintiff's third request to have the blinds drawn, and after one of the men at the table also complained and asked to have the shade drawn, they were. After that Plaintiff was able to turn around to watch the rest of the presentations and participate in the exercises for "group" experience, which was after the break at about 10:30am, which was two hours into the meeting, which then ended at about 11:00.

29.    Plaintiff didn't know any of the other attendees sitting at her table. She learned a few days after the meeting the individual who requested the shades be drawn was Scott Banford. Plaintiff was informed by another co-worker that he had discussed Plaintiff's situation at the meeting describing her as the poor woman who was ill and was being blinded by the sunlight coming through the window.

30.    Shortly before the August 29, 2019 meeting Plaintiff requested a reasonable accommodation to be excused from attending which was denied. During the meeting Plaintiff requested a reasonable accommodation – to close the blinds. This was a few months after Plaintiff threatened to file a charge of discrimination and formally sought working from home as an

accommodation. On September 5, 2019, less than a week after the August 29, 2019 meeting Defendant terminated Plaintiff's employment.

31.    In a phone call with HR present, Ms. Dodge proceeded to explain that Plaintiff's employment was being terminated due to behavior that was "observed" by unnamed persons at the Regional Branding Meeting that occurred on August 29, 2019. When Plaintiff was terminated on September 5, 2019, the only reason she was given for the termination was that she was "observed" rolling her eyes, sighing, and shrugging her shoulders, at the Branding Meeting, which McKendry deemed to be "insubordinate behavior." The only other thing mentioned as a reason was a comment made in the ladies' room regarding the coldness of the water coming from the faucet that was murmured to herself.

32.    During the termination call, Plaintiff requested Ms. Dodge provide her the details as to what the "observed" behavior was that resulted in the decision to terminate her employment. She indicated that the reason for her termination was due to her rolling her eyes, shrugging her shoulders and sighing during the speech given by McKendry and for a comment made in the ladies' room regarding the coldness of the water coming from the faucet that was murmured to herself.

33.    Plaintiff asked why these allegations weren't brought to her attention immediately after the allegations were made so that she could respond to the unfounded allegations. Plaintiff was advised that no discussion was necessary because the decision was made and that there wasn't any requirement that the allegations had to be discussed with her prior to her termination.

34.    The next day Plaintiff sent an email to Gloria Davis and demanded, the names of the people who made the allegations and the reasons for her termination in writing. Davis responded in an email dated September 6, 2019. In the email, Defendant informed Plaintiff that

Carolyn Dodge received a call from Mr. McKendry, at 11:12am, Thursday August 29, 2019, "to relate insubordinate behavior" by Plaintiff in the Regional Brand Kickoff meeting for regional leaders. McKendry shared that during his speech Plaintiff "was observed with physical expression and behavior in the form of multiple eye rolls and sighs/shrugs." She also stated that: "He [McKendry] related that this behavior was brought to his attention by several other attendees including Cindi Lewis." No mention was made of the comment made in the bathroom about there not being hot water.

35.    In response to Plaintiff's charge of discrimination, Defendant alleged that McKendry observed Plaintiff "making inappropriate and disrespectful gestures during his presentation "(rolling her eyes, etc.)." That statement is blatantly false as to the substance and also contradicts the statements made by Defendant in the above referenced email.  The email Davis sent did not state that McKendry observed the behavior, it stated that the behavior was "brought to his attention by other attendees…"  Plaintiff previously asked Davis who the specific people were, but she never got a response to that request as the email sent in response only noted Cindi Lewis while alluding to others.  In any event, no one could have observed Plaintiff's eyes since she had her hand covering her eyes to shield them from the sunlight that was coming through the window directly across from where she was sitting. Plaintiff never rolled her eyes as alleged.

36.    Plaintiff had never met Cindi Lewis until the day of the Branding Meeting, when she went up to her after the meeting to compliment her on her presentation wherein Plaintiff told her how impressed she was with her presentation. Plaintiff finds it extremely difficult to believe that she could have even seen her eyes, since during McKendry's speech she was standing at the back of the room, and although Plaintiff had her back to McKendry, (so she was facing Lewis),

but she had her hand covering her eyes. During Ms. Lewis' presentation Plaintiff had her back to her during the presentation due to the sunlight coming through the open blinds.

37.    As far as hearing Plaintiff or anyone at her table sighing, that would have been impossible for two reasons, one that never happened, and two, Plaintiff was sitting at a table all the way in the front of the room, and if Cindi Lewis heard sighing, then that would have disrupted the entire meeting as it would have been loud enough to be heard all of the way in the back of the room. If anyone observed anything, it would have been reactions to Plaintiff's cancer medication which causes hot flashes, and which caused her to keep taking her jacket on and off during the meeting. Plaintiff also was having a vertigo episode, which made her extremely dizzy and nauseas. The gentleman next to her observe Plaintiff's struggles that day. However, he was never contacted by Defendant about what he observed prior to Defendant terminating Plaintiff's employment.

38.    It would have been impossible for McKendry, or Ms. Lewis, to see Plaintiff's eyes much less being in a position to observe and conclude insubordinate rolling of the eyes occurred as since her back was towards McKendry during his entire presentation, and Ms. Lewis' presentation and otherwise she was shielding her eyes from the sun during those speeches. Plaintiff was suffering from excessive eye watering which caused her to blink but no reasonable person could have deduced this to be eye rolling as alleged by Defendant. Plaintiff was also very dizzy and nauseas during McKendry's presentation which likely caused her to take periodic deep breathes but no reasonable person could have perceived it as sighing. Plaintiff was visible ill.

39.    Further, if Defendant's contentions at the EEOC are accurate McKendry himself observed the behavior during his presentation and concluded it was insubordinate. However, Plaintiff went up to McKendry, so say "hello" and to Ms. Lewis, to introduce herself to her, after the meeting and neither one of them stated anything to Plaintiff about their observing any shoulder

shrugging, eye rolling or any insubordinate behavior by Plaintiff at the meeting. As such, Defendant did not respond in real time to the perceived insubordinate action in any way which would reflect that it actually believed the conduct occurred or was evidence of insubordination.

40.     Defendant did not conduct a reasonable inquiry to attempt to determine what occurred at the meeting. Scott Bamford was not contacted. After Plaintiff was terminated, she contacted Mr. Banford who confirmed his conversation with the other employee regarding her issues at the Branding Meeting and also confirmed that he was the gentleman that was sitting at the table with Plaintiff who had requested that the shades be drawn on the window. Mr. Banford stated that he had not been contacted by Ameris regarding their allegations of Plaintiff's alleged "insubordinate behavior," but if he had, he would have corroborated her version of what took place at the Branding Meeting.

41.     Plaintiff was never given the opportunity to defend herself against the false allegations that resulted in her termination. Ms. Dodge alleged that she attempted to contact Plaintiff following her call with McKendry to discuss the "situation" that occurred at the Branding Meeting. According to information provided to Plaintiff, McKendry contacted Ms. Dodge at 11:12 on August 29, 2019. Plaintiff did not receive any call from Ms. Dodge at that time, nor at any time that day. Plaintiff was never asked to account for the events at the meeting or respond to the allegations made against her. Plaintiff did call Ms. Dodge the day after the branding meeting regarding an unrelated work matter and she was cold and standoffish. When Plaintiff asked her if there was something wrong, she stated there wasn't anything wrong. She made no mention of issues relating to the branding meeting. Defendant later alleged that Ms. Dodge attempted to contact Plaintiff to discuss the situation on August 29, 2019. This did not occur. Defendant did not claim any further attempt was made to discuss the matter with her prior to informing Plaintiff that

she was terminated. Notably, Plaintiff also made calls to Ms. Dodge every workday from August 30, 2019, until September 5, 2019, and when they did speak, she made no mention of what Ms. Dodge referred to as "the situation" in her claim of the telephone call on August 29, 2019, which did not occur.

42.    Defendant's articulated reason for terminating Plaintiff's employment was false, unworthy of belief and pretextual.

43.    Shortly before Plaintiff's termination, there were numerous layoffs due to Ameris merging with Fidelity Bank.  As part of that lay off, two associates in the Compliance Department, who were women, both over the age of 65, and both with the most experience and years of service with Ameris, were told they either had to take early retirement or get laid off.  Defendant retained substantially younger employees in the same job classification. The reason given for Plaintiff's termination was a pretext. Ameris was intent on terminating all of the older women in the Compliance Department. Rather than use a reduction in force as the mechanism Defendant concocted false accusations, conducted no inquiry calculated to find out the truth, and terminated Plaintiff for reasons which are false.

44.    Notably, even if Defendant believed Plaintiff rolled her eyes or shrugged her shoulders, Ms. Dodge who received the call from Mr. McKendry was aware that Plaintiff was suffering symptoms from her disability on the day of the meeting. Therefore, Defendant was or should have been aware that any behavior it perceived as unusual was likely a result of Plaintiff being extremely dizzy and nauseas, suffering hot flashes and then chills and suffering from watering eyes and eye discomfort.

45.    Plaintiff was 67 years of age at the time of her unlawful termination.

46.     Plaintiff was replaced by a substantially younger female.

47.     As a consequence of Defendant's illegal conduct, Plaintiff has retained counsel to represent her in this matter.  Plaintiff has incurred, and will continue to incur, attorneys' fees and costs associated with that representation.

## COUNT I:  HANDICAP DISCRIMINATION IN VIOLATION OF
## THE FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 ET. SEQ.

48.     The Plaintiff restates and realleges each and every factual allegation contained in paragraphs one (1) through forty-two (42) and paragraph forty-seven (47).

49.     Plaintiff's condition(s) (Vertigo, Cancer and resulting complications from cancer medications, and her cataracts) is a handicap within the meaning of the Florida Civil Rights Act of 1992.

50.     Defendant's termination of Plaintiff, was based on her impairment, and/or her record of such impairment and/or his having been regarded as having such impairment.  Defendant would have continued to employ Plaintiff but for her handicap.

51.     The discriminatory practices described above were done by Defendant willfully, maliciously and with a reckless disregard for the Plaintiff's rights under Florida law.

52.     Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

53.     Defendant's termination of Plaintiff due to her handicap has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for lost wages, other pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff demands a trial by jury and relief in the form of back pay, front pay, lost benefits, compensatory damages and emotional distress damages, punitive damages,

attorney's fees and costs with prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled to under the law.

## COUNT II:  RETALIATION IN VIOLATION OF THE
## FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 *ET SEQ*

54.     Plaintiff hereby restates and realleges each and every factual allegation contained in paragraphs one (1) through forty-two (42) and paragraph forty-seven (47).

55.     Plaintiff's medical conditions as specified in count I, qualified as a handicap within the meaning of the FCRA.  Accordingly, Plaintiff was entitled to a reasonable accommodation. At a minimum Plaintiff made requests for reasonable accommodations with a good faith belief that she had a disability or handicap within the meaning of state law.

56.     Plaintiff sought reasonable accommodations. HR, McKendry and Dodge were fully aware of Plaintiff's disability and her need for accommodation. Plaintiff formally sought a reasonable accommodation after she was informed that McKendry required her to work on site full time in late February 2018. Shortly before the August 29, 2019 meeting Plaintiff requested a reasonable accommodation to be excused from attending which was denied. During the meeting Plaintiff requested a reasonable accommodation – to close the shades. This was a few months after Plaintiff threatened to file a charge of discrimination and formally sought working from home as an accommodation. On September 5, 2019, less than a week after the August 29, 2019 meeting Defendant terminated Plaintiff's employment.

57.     Defendant retaliated against Plaintiff for exercising her rights under the FCRA and having sought reasonable accommodations - the last two of which occurred approximately a week before her termination.

58.    Plaintiff's protected activity was a motivating factor in, if not the but-for cause of, her termination.

59.    The employer's actions were done intentionally, willfully and maliciously and with a reckless disregard for Plaintiff's rights under the FCRA.

60.    Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

61.    Defendant's discrimination and retaliation against Plaintiff due to his handicap and his request for a reasonable accommodation has caused, and will continue to cause, Plaintiff to suffer substantial damages for lost wages, other pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff demands a trial by jury, and relief in the form of lost wages, backpay and frontpay, compensatory damages, punitive damages, emotional distress damages, prejudgment interest, attorney's fees and costs under the FCRA and Section 448.08, Florida Statutes, injunctive relief, including reinstatement and any other such relief that the Court deems just and appropriate.

### COUNT III:  DISCRIMINATION IN VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITES ACT OF 1990, 42 U.S.C. 12101 *ET SEQ*, AS AMENDED BY THE ADAAA

62.    Plaintiff hereby restates and realleges each and every factual allegation contained in paragraphs one (1) through forty-two (42) and paragraph forty-seven (47).

63.    Plaintiff's condition(s) (Vertigo, Cancer and resulting complications from cancer medications, and her cataracts – collectively referred to as disability) qualifies as a disability under the ADA.

64.    Plaintiff's disability was a motivating factor in, if not the but-for cause of, Plaintiff's termination.

65.    The discriminatory practices described above were done by Defendant willfully, maliciously and with a reckless disregard for the Plaintiff's rights under the ADA.

66.    Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

66.    Defendant's discrimination against Plaintiff due to her disability has caused, and will continue to cause, Plaintiff to suffer substantial damages for lost wages, other pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff demands a trial by jury and relief in the form of back pay, front pay, lost benefits, compensatory damages and emotional distress damages, punitive damages, attorneys' fees and costs under the ADA, prejudgment interest thereon, injunctive relief and reinstatement, and any other such relief that Plaintiff may be entitled to under the law.

## COUNT IV:  RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. 12101 *ET SEQ*, AS AMENDED BY THE ADAAA

63.    Plaintiff hereby restates and realleges each and every factual allegation contained in paragraphs one (1) through forty-two (42) and paragraph forty-seven (47).

64.    Plaintiff's medical conditions as specified in count I, qualified as a disability within the meaning of the ADA.  Accordingly, Plaintiff was entitled to a reasonable accommodation. At a minimum Plaintiff made requests for reasonable accommodations with a good faith belief that she had a disability or handicap within the meaning of the ADA.  Accordingly, Plaintiff was entitled to a reasonable accommodation.

65.     Plaintiff sought reasonable accommodations. Plaintiff formally sought a reasonable accommodation after she was informed that McKendry required her to work on site full time in late February 2018. Shortly before the August 29, 2019 meeting Plaintiff requested a reasonable accommodation to be excused from attending which was denied. During the meeting Plaintiff requested a reasonable accommodation – to close the shades. This was a few months after Plaintiff threatened to file a charge of discrimination and formally sought working from home as an accommodation. On September 5, 2019, less than a week after the August 29, 2019 meeting Defendant terminated Plaintiff's employment. HR, McKendry and Dodge were fully aware of Plaintiff's disability and her need for accommodation.

66.     Defendant retaliated against Plaintiff for exercising her rights under the ADA and having sought reasonable accommodations - the last two of which occurred approximately a week before her termination.

67.     Plaintiff's protected activity was a motivating factor in, if not the but-for cause of, her termination.

68.     The employer's actions were done intentionally, willfully and maliciously and with a reckless disregard for Plaintiff's rights under the ADA.

69.     Plaintiff has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

61.     Defendant's discrimination and retaliation against Plaintiff due to her handicap and her request for a reasonable accommodation has caused, and will continue to cause, Plaintiff to suffer substantial damages for lost wages, other pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff demands a trial by jury, and relief in the form of lost wages, backpay and front pay, compensatory damages, punitive damages, emotional distress damages, prejudgment interest, attorney's fees and costs pursuant to the ADA, injunctive relief, including reinstatement and any other such relief that the Court deems just and appropriate.

### COUNT V: AGE DISCRIMINATION (TERMINATION) IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992, FLA. STAT. 760 ET SEQ.

62. Plaintiff hereby restates and realleges each and every factual allegation contained in paragraphs one (1) through seven (7), twelve (12) through thirteen (13), eighteen (18) through twenty-nine (29), and thirty-one (31) through forty-seven (47).

63. Defendant is, and at all material times has been, an employer within the meaning of the FCRA.

64. Plaintiff is the member of a protected class (age), was qualified for the position she held, and was subjected to adverse employment action when she was terminated. Further, Plaintiff was replaced by a substantially younger person, as that phrase has been interpreted under applicable law.

65. Plaintiff's protected class (age) was a motivating factor, as well as a but-for cause, of the adverse employment action to which she was subjected.

66. The discrimination described above was done maliciously, intentionally, and with a reckless disregard for Plaintiff's protected rights under the law.

67. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and has suffered and continues to suffer mental anguish, distress, humiliation, great expense, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, compensatory and emotional distress damages, damages for loss of earning capacity, repayment for attorneys' fees and costs pursuant to § 760.11, punitive damages, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

## COUNT VI: AGE DISCRIMINATION (TERMINATION) IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 621 ET SEQ.

68.    Plaintiff hereby restates and realleges each and every factual allegation contained in paragraphs one (1) through seven (7), twelve (12) through thirteen (13), eighteen (18) through twenty-nine (29), and thirty-one (31) through forty-seven (47).

69.    Defendant is, and has at all material times been, an employer within the meaning of the ADEA.

70.    Plaintiff is the member of a protected class (age), was qualified for the position that she held, and was subjected to an adverse employment action when she was unlawfully terminated.

72.    Plaintiff's protected class (age) was a motivating factor, as well as a but for cause, of the adverse employment action to which she was subjected.

73.    The discrimination described above was done maliciously, intentionally, and with a reckless disregard for Plaintiff's protected rights under the law.

74.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of earning capacity, loss of other employment benefits, and has suffered and continues to suffer mental anguish, distress, humiliation, great expense, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands a trial by jury and relief in the form of economic damages, back pay, reinstatement or front pay, liquidated damages, damages for loss of earning capacity, repayment for attorneys' fees and costs pursuant to 29 U.S.C. § 626, prejudgment interest, equitable relief, and any and all other relief that the court deems just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Samuel B. Kanupp
Archibald J. Thomas, III
Florida Bar No. 231657
thomas@job-rights.com
Samuel B. Kanupp
Florida Bar No. 0067216
samuel@job-rights.com
ARCHIBALD J. THOMAS, III, P.A.
Suite 255, Quadrant I
4651 Salisbury Road
Jacksonville, Florida 32256
(904) 396-2322 (Telephone)
(904) 296-2341 (Facsimile)
ATTORNEYS FOR PLAINTIFF